May it please the Court, for fourteen years since this Court decided Griffin, it has been the law of this circuit that unissued tax credits in the hands of the state are not property under the mail and wire fraud statutes, which means this case never should have gone to trial. It also means that there was no fair warning to the defendants in this case. The central holding of Cleveland is both straightforward and unmistakable. The thing obtained has to be property in the hands of the victim. The things obtained here were unissued tax credits. In the second superseding indictment, the scheme to defraud is specifically defined in paragraph two of counts two through twenty as a scheme for, quote, the purpose of obtaining film infrastructure tax credits, end quotes. You said unissued tax credits. At least a million was approved and then it was sold and I assume that those were credited against Louisiana tax obligations. Yes, that's correct. So why do you say unissued? Because the scheme is for the purpose of obtaining the tax credits. That's how they define it. They don't define it as a scheme for defrauding anybody after the tax credits are issued. They define the scheme as for the purpose of obtaining the tax credits. And since what we are looking for under Cleveland is what is the status of the thing, the object, in the hands of the victim? Well, let me give you a hypothetical. Let's say instead of tax credits for film infrastructure projects, the state of Louisiana says, we're just going to give you grants. You know, apply, show us you're doing these infrastructure projects and we'll just give you, you know, if you do three million dollars in projects, we'll give you a grant of a million dollars to help with that. Would that be property? That could be property, but that's not what happened in this case. I know, but isn't, any economist will tell you that a tax credit or a tax deduction is exactly the same thing from an economic standpoint as the government just giving someone a grant? Well, it The effect on the state's bottom line is exactly the same. The effect on the state's bottom line could be the same, but what we are dealing with is the mail fraud statute and how that specific statute under Cleveland defines property and how it looks to what has historically been the definition of property. And if you go to the core holding of Cleveland and if you look at the three Cleveland factors, Cleveland is very, very careful to distinguish between taxes due and owing and unissued tax credits. What Cleveland specifically looks for is, one, what is the nature of the state's core concern regarding the object? And two, is the state's interest as a sovereign or as a property holder? There's not some inventory of tax credits that the state can suddenly go to and say, oh, here, we'll take one out of the closet and issue it to you because it's property. The state is creating these tax credits when it issues them. And the third issue in Cleveland and the third factor is whether this constitutes, would constitute, treating it as property would constitute a sweeping approval of a huge expansion of federal jurisdiction. If this court recognizes these tax credits as property, these unissued tax credits will allow the federal government to prosecute every false statement on a state tax return in Texas, Louisiana, and Mississippi. What do you, the hardest problem that you've got is that these things can be bought and sold. That's correct, but they can't be bought and sold until after they are issued. And what Cleveland tells us we have to look to is what is the status of this object in the hands of the victim. We don't look to what the status of these is later. There's no question but that after these credits are issued and they are out in the open market, that's property. That's the equivalent of the grant that Your Honor pointed to. But until they are issued, they don't exist. Recently in the BP Exploration case, this court described these tax credits by saying they're not merchandise, they're nothing more than financial abstractions. And that's the problem with this case. Has there been any guidance in the other circuits on tax credits? The fountain, well, this court in Griffin said flat out these are not property under between unissued tax credits and taxes assessed due and owing. And it recognized a property right in the latter but not in the former. And so all the, no other prosecutor's office has brought a case that I am aware of anywhere on unissued tax credits. It is only this office that has taken the very aggressive posture of saying no, this is property. It's not. Cleveland tells us over and over, this is just not property. And let's assume for a second that even if it is property, where's the fair warning to the defendants in this case? Because if you go back to this court's decision in Bankston, which is actually the name that this court gave to the Cleveland decision before it was reversed by the Supreme Court, in Bankston, this court said that the only reason it can be said that the defendants had fair warning in the case is because there were other circuit courts of appeal opinions saying, well, these things might be treated as property. There is no decision that the defendants could have relied on in this case that said, oh, these unissued tax credits were property. In fact, just to the contrary, this court had said in Griffin, no, they're not property. So what were the defendants to rely on in this case? They certainly couldn't rely on the State regulations in this case. The regulations weren't issued until 8 years after the tax program went into effect. Roberts. Your time is winding down, so let me just move on to one other issue. I know you have some rebuttal time, too, after the government gets up. But I want to ask you about the probation sentence your client received. His guidelines were 168 to 210 months. Can you cite to any comparable probation case with that big a guideline range that has been reviewed on appeal in our circuit? I cannot, Your Honor. Okay. But I think that given all of the concerns that Judge Feldman had regarding this case, concerns you can't just take one. I saw all those, and he says there was no loss because the State actually got this house, got renovated. I've seen all that. But one of those concerns he cited or one of the factors he cited, there's a lot. I've read it. He says your clients are good people. They've done a lot of community service. But the reality is the criminal justice system is filled with good people. I have no reason to doubt what Judge Feldman said, and I'm sure your clients are good folks who've done a lot of good for their families and the community. But that is not that anomalous in the criminal justice system. The most common type of crime charged in our circuit is illegal free entry. A lot of those are folks coming from Mexico and Central America who are good people just trying to make more money for their families. But when they get convicted of that crime, as the law says, they often go to prison. And so is that fact or something that can be . . . isn't reliance on the community service and these other factors the kinds of considerations that the guidelines were giving lenient sentences? May I respond, Your Honor? Sure. I see I'm out of time. Your Honor, what the guidelines are designed to do is to take into consideration all of these factors. And different cases will weight the factors differently. If you look at this case as a no-loss case, the guidelines would call for a probationary sentence. That would put you at a probationary sentence level. So it is only our arcane or the guidelines' complex view of what constitutes loss in this case . . . Well, intended loss is because the guidelines look at intended loss. But that assumes that they intended to impose a loss on the state of Louisiana. And if you . . . Then why aren't you arguing the guidelines are wrong? I mean, if you're saying the loss amount isn't accurately reflected in the guidelines . . . Well, ultimately, we do argue that the guidelines were wrong in this case. You can answer more on rebuttals since it's already been brought up. I think I have to call time on you because we're going to get way beyond our limits if we don't exercise a little discipline. We'll hear next from Mr. Rosenberg. Please record. First of all, I'd like to invite the court's attention to the fact that, as the district judge pointedly observed, Susan Hoffman was barely mentioned during a two-week trial. There was no evidence that she was involved in any In fact, even the documents that the government offered, the agent who was testifying for the government had to acknowledge that he was in error and that was not her signature on the documents. So what does the government do? Unable to prove an intent to defraud, which is what they had to do in the absence of a loss under cases such as U.S. v. DiMato by the Second Circuit, they default to a conspiracy claim. They contend that there was some form of conspiracy under Section 371. And I submit to your honors that too falls flat. Because there was no conspiracy, they didn't prove any intent to defraud, and they didn't prove that she purposefully availed herself of a fraudulent scheme or engaged in that scheme. And so, oddly, what did the government suggest? Well, they suggested that because she had almost daily conversations, which was not proven by bona fide evidence, but she had telephone conferences with Peter Hoffman, that that is somehow part of a conspiracy. Well, I'd suggest to your honors, frankly, if we're going to curtail telephone conversations between spouses and children and loved ones, and that's going to be a conspiracy, nobody will be talking on the phone. Nobody will be passing that absence of evidence and the government's suggestion, which just defies common sense in the law. What the government now suggests to your honors is based upon conjecture and speculation. There is just an abject absence of evidence. And Judge Costa, before we hear from Judge King, well, what about the rational juror issue? And I'm aware of that because I know Judge Dennis may butcher the name of the case, Najuku, which you sat on with Judge Clement and Judge Southwick, and Judge Costa, which last week you just mentioned in the Sanjar opinion. But I suggest to your honors that you have to look at the evidence de novo, and that's what those cases say. And if you look at the evidence de novo, Susan Hoffman did not participate in a conspiracy, and there was no fraudulent intent. And I'd ask you to consider those issues. Now, recognizing its lack of proof, what does the government do? They fall back on even yet another contingent plan. They say, well, they almost create a new legal standard, and they say she was not oblivious of efforts to seek legitimate tax credits. Well, respectfully to the government, that double negative is not proof of criminal conduct. It's just not. Not oblivious is not part of a criminal scheme or a basis for finding her culpable. Now, there was just no evidence to show that Susan Hoffman deliberately engaged in any alleged conspiracy or engaged in intent to defraud. And absent that evidence, we suggest to your honors that the three remaining counts should be reversed, and those guilty verdicts should be vacated. Now, Judge Costa, I want to get in because Mr. Lawson stole a little bit of my time. I looked at my notes on sentencing. I was going to address that. But I'd like to do that if it pleases the court. Despite 34 years on the bench as a district judge, the government assails the tailored sentences meted out by Judge Feldman. And among the peculiar arguments that the government makes is that he did not recite the term sentencing guidelines frequently enough to suit the government. Well, beyond that, they sort of jumped from that position to say, wait a minute, he didn't even mention Section 3553. Both of those contentions are wrong. The record shows clearly that he referred to the guidelines in deciding the tailored sentences. He mentioned Section 3553, and its purpose. He went over the PSRs because, as your honors know, there were a number of objections to the PSRs. And so he was mindful of the sentencing guidelines. I would suggest to your honors that I will say in a rare moment of common agreement between the government and the defendants that we both referred, your honors, to Gall v. United States. But in Gall, the Supreme Court said you have to have individually centered sentences. And that's what Judge Feldman did. He individually tailored the sentences consistent with the Supreme Court's pronouncement in Pepper, consistent with the Supreme Court's announcement in Kimbrough. And, Judge Costa, I'd like to specifically address your question, which is, well, how do you have this disparity? Because I know the government Not as great for your client, not nearly as significant. No, your honor. But I'm here to try to speak for all three. And I know the government tried to make hay out of that. And as Mr. Lawson said, if you take out the loss factor, and, of course, Judge Feldman took out the sophisticated enhancement for Susan Hoffman, you are down into the 7 to 11 ratio under the guidelines, which would not be an uncontroversial departure, and certainly within the wide discretion afforded a district judge that's given to him by this court repeatedly, repeatedly. When the government comes here and asks you not to disturb the sentence, they say, don't disturb the discretion of the district judge. That's exactly what we are saying. But they gained close to $1 million. They sold them for, what, $930,000. There are sentences every day given out in this district for people who make $5,000, if that, bringing people across the border. They're getting prison time. So there does seem to be a significant disparity in a case where there is a sizable amount of money that the defendants received. Judge Costa, I don't disagree that there is a disparity from, say, a drug dealer to these individuals, but that's the exact purpose of the Supreme Court's ruling in Booker and its progeny. That's the exact purpose of its statements in Gall. One of the exact purposes of the sentencing guidelines was to prevent judges who can understandably identify with white-collar defendants more than they can with street criminals, from giving them far more lenient sentences than those street criminals. Well, I dare say that if you look at the three decades of Judge Feldman's tenure on the bench, he's not been the one to be lenient to white-collar defendants. And I know my time is up, so I just want to touch upon one other issue briefly, and that is forfeiture. We've questioned the appropriateness of forfeiture, and we submit that there was no nexus between the property in the defendant's hands and the offense, and that requirement is essential. Whether they use 981 or they use Section 853 for substituted property, they have to show a nexus. They didn't show it. This is a statute, as Your Honors recognize, is confusing, is unclear, recognized by two different district judges, and we submit that under those circumstances these guilty verdicts should be vacated. Thank you, Judge Dennis. Mr. Gibbons? Good morning. May it please the Court, my name is Billy Gibbons, and I'm here for Michael Arata. And I'm here to talk about the Rule 29 issues, but Judge Kostin, in response to your question about other cases where there have been substantial departures, although the cases that we cited in a few, Tomko and Rowan are Fifth Circuit cases that were substantial departures from high guideline sentences to probation in the Fifth Circuit. And also, Judge, I would just like to point out or call the Court's attention to Gall, in which the Supreme Court has cautioned against looking at proportional justifications for the extent of departures. But doesn't our case law say the greater the departure, the more need for justification? And maybe that justification is here, but it does increase the need for justification. It does, Your Honor. And what I would say is that Judge Fellman's justification in this case, although he did say, he did talk about good deeds and these are good people, but his real justification, which he did incorporate into his sentencing decision, was his 124-page order and reasons on the Rule 29 motions, in which he expressed great discomfort with this case, with the government's prosecution, and with the outcome. And I'd like to say, Your Honors, that there's two main reasons for that. The first is his common-sense approach to what he saw in this case, which is that the defendant spent $5 million to develop a film studio that they said they were going to develop. It went into commerce. It produced, it made productions, and it was actually touted by the State as one of the great successes of the infrastructure program. The second thing is that the Court found and the government's own witnesses testified that a post-mortem audit that was done by a forensic accountant hired by the State actually found that they earned the $1.1 million in tax credits that they received. And then finally, they actually spent, based on the $5 million that the defendant spent under the program, which would give you 40% of every dollar that you spend, they were entitled to more than the $1.1 million. And so just from his common-sense approach, that was one reason that the judge was uncomfortable with the case and noted that it was not the ordinary fraud case. And I think that was one of the big reasons for the result that he reached here. The second reason was that the judge was very uncomfortable with the government's allegations of concealment in this case. And in particular, the main example that I want to bring up now, since the limited time we have, is on, for Mr. Arata's, Mr. Arata was convicted, charged and convicted of making a false statement when he said, I thought I disclosed to the auditors both sides of these circular transactions. And the judge threw that out because there was documented evidence that it actually was disclosed. And I wanted to talk for a second about circular transactions, because that was a very large part of the government's case, and it's something that no one would ever have heard of outside of this. It was a very unusual thing that developed in the film credit industry in Louisiana. And it goes back to what we have, we have an exhibit on this, Arata Exhibit 231, is a unanimous resolution passed by the Louisiana legislature in 2008. And this is a number of years after the program came into existence. And what it said is that we acknowledge, the legislature is acknowledging that we have allowed tax credit expenditures for, by means, for expenditures by means of cash, bonds, exchange, loans made for a lender, regardless of who holds the promissory note, even the property owner. And so what that is recognizing, what that led to is a very unusual transaction that was allowed in this program where you could loan money or equipment or property to yourself, pay yourself back, and that was considered a tax credit expenditure by the state of Louisiana. And that is what led to these, what we've been calling in this case, circular transactions, which was One case I'm talking about, is that in your brief? Yes, sir. Yes, sir. It's in our brief, and it's Arata Exhibit 231 is the resolution. One case, four or five times on one day. Yes, ma'am. And, but by the end of this case, there were two of the government's witnesses, Katie Cookler Davis and John Terrio, who were both auditors who were actually on the audit that was submitted to the state to get the $1.1 million in tax credits. In this case, both testified that, yes, circular transactions are used in this tax credit program. And Judge Fellman found in his order and reasons, and that's at page 3683 of the record, that it was undisputed that circular transactions are not unlawful so long as they're properly disclosed. And that's our only criticism of Judge Fellman's Rule 29 motion. Of our Rule 29, his order, reasons, and our Rule 29 motion. Let me ask one. And he found that there was a withdrawal from the conspiracy for your client. Why didn't you ask for a jury instruction on withdrawal of conspiracy? That's how that usually arises. It is. It is, Judge. And I really think that this issue is kind of a red herring on appeal because at trial we were arguing factual innocence that we were not involved in the conspiracy. Never a part of the conspiracy. Yes, sir. And Mr. Arata was acquitted of Count 17, which was the submission of the second tax credit application that went in after he left the project. And the testimony of the government's lead case agent at trial was that the concern, the government's concern, was that after he left the project was this issue with attorneys' fees being included in the second application. But you don't think Judge Fellman's withdrawal finding affected any of the acquittals he granted? I don't think it did, Judge, because really the only acquittal that had to do with anything after the fact by Mr. Arata was the, had to do with the appeal, I mean, I'm sorry, with the inclusion of the attorneys' fees in the second transaction, which he did acquit him of substantively of that on the second, it was one of the false statement counts. And that was what the government argued at trial was the activity that they were concerned with post-withdrawal from the project. Thank you. Thank you, sir. Mr. Kammer. Kammer, yes, sir. Thank you. Good afternoon, Your Honors. May I proceed? Yes, Your Honor. My name is Dal Kammer. I'm also here today with my fellow trial counsel, Chandra Menon and Jim Baer, and our appellate chief, Kevin Boitman, is here with me as well. I'd like to, I think that's already, we have this covered, but I'd like to reserve four minutes for rebuttal. Contrary to what the defense has suggested here today, Your Honors, this really was a textbook fraud case. To emphasize this, I would like to respond to some of the issues just raised by the defendants. First of all, a lot of the defendants' arguments wrap around ideas of what the state law was, custom and practice, and as I believe it was Mr. Rosenberg mentioned, this idea of fair warning. The blatant fraudulent conduct presented at the trial stands in stark contrast to these defendants' attempts to make this case about it, which was not what the government's theory of the prosecution was. At the outset, it should be noted that the defendants were put on notice by the state with a precertification agreement that certain expenditures had to actually been made by December 31st of 2008. This was a signed precertification agreement that Michael Arata signed on behalf of the defendants. A promise to pay was not sufficient. A future payment was not enough. That would have been the government's first exhibit, GX1. Indeed, the head of the infrastructure program, before even the first application was filed, warned Arata that expenditures had to be final and quote, in the vendor's pocket and not controlled by you. And Arata shared this conversation with Peter Hoffman, as you can see in Government Exhibit 283. It's an email from Arata to Peter Hoffman. So they were on notice. To emphasize the disparity, and we mentioned this goes into the idea of circular transactions that Mr. Gibbons just said was commonplace amongst these programs, well, lots of things can be commonplace, but it depends on how you use them. Did you use them to intentionally defraud somebody? And I'd like to go through briefly, there's many examples that we put on trial of the different types of expenditures that took place, but it's important for me to emphasize what the activities that occurred here are and how they stand in stark contrast to what the defendants claimed to have been confused about. Are you going to address whether these tax credits are property for purposes of mail and wire fraud? I am going to address that, Judge. I can do that now if you would like. It's bothering me. I think it's a close question and it will affect the case. I'll jump to that right now, Judge, and I can come back to this other part. The Cleveland and Griffin issue, of course, the judge district court pointed out at pages 259 through 260 of the record that this case was, as we said, a textbook fraud case. It was entirely about money or property. The fraud here occurred after the pre-certification process, unlike in Griffin. In Griffin, they were defrauding the state to get authority, a regulatory decision by the state, to be able to do future work, to develop low-income housing records, housing that if at some point that was finished, they could then get tax credits. In this case, the defendants, and actually in those, the state was not entitled to a positive income flow as it was in this case, which was pointed out by the Second Circuit in the Fountain case. The fraud was not as the defendants claimed for unissued tax credits. It was for the issuance of active tax credits. That's what the fraud was aimed at after the pre-certification agreement had entered, and that would be the Grand Jury Exhibit One I mentioned earlier. Importantly, the defendant's position on this would ignore well-studded law. First of all, the state's right to taxes for the purposes of wire fraud statutes is property, as the U.S. Supreme Court held in the Pasquantino case. Second, the defendants claim that the state is the only named defendant, i.e., the state of Louisiana in the indictment. However, they ignore this court's ruling in Hatch in 1991 that it is not necessary for the indictment to define a particular victim. Next, the defendants, in their argument regarding Cleveland, the defendants claim that investors were not deceived. But they ignore the fact that the victim who loses money need not be the same as that one that the deception was aimed to. This court ruled on that in the McMillan case. That was the convergence argument that was rejected, and that was in 2010. Also, the defendants rely on the district court, largely rely, found no loss. However, they ignore that actual loss not be proven, also the McMillan case. This is about the sufficiency of the indictment, this argument, not the defendants' disagreement with the facts of the case. And also they mentioned issues with federalism problems with this case. And I'd like to point out that this case presents no such problems. This case was about companies located across the United States, banks located across the United States, wire transfers and mailings, and also attaching to international companies and banks. This does not violate the federalism principles. And also, what also gets glossed over here and has been argued by the defense several times was this is the government stepping on and doing something, you know, not agreeing with what the state does. What gets glossed over here is that the state found this fraud and asked us to come in and help them. They found out what was going on through their internal forensic autogram, Michael Daigle, and they requested our help to come into this after they found the fraud. This isn't a situation where the state thought everything was okay and this is custom and practice. They asked for the federal government to come in because they could see the fraud that had occurred. Your Honors, I'd like to jump back just real briefly to this idea because I do think it is very important with the types of actions and activities that we're talking about in this case. And there's one, there's many different fraudulent expenditures that were submitted. But one in particular I'd like to emphasize to you that goes to this idea of circular transactions. And it's the defendant's claim that they purchased over a million dollars in equipment from a supposed Louisiana equipment vendor named Damon Martin. To make it appear as if, and we have just talked about that the state required that this be a final payment in the vendor's pocket, not controlled by you. To get around that, showing that they well knew what the state required and sought to deceive it. To make it appear as if the equipment was purchased by an independent Louisiana vendor before that December 31, 2008 deadline, Michael Arado, a practicing attorney and notary in Louisiana, registered a Louisiana company in Martin's name at an address and telephone numbers controlled by the defendants. He forged Martin's signature on the application. He forged the signatures of two witnesses to that Secretary of State filing, and then he personally notarized it and filed it with the state. Next, a local bank account was opened up in Martin's company's name, but the account was controlled by the defendants, not Martin. And this is important when we talk about related parties and whether this was truly an independent vendor as they were representing this to the state. The address on the bank account was Michael Arado's, and the lead signatory of that account was Peter Hoffman. Mr. Martin received no bank statements, no checks, no money, no nothing through this account. Because Seven Arch, Louisiana, which we call SAPLA for short, the company that the defendants owned that was related to this, bank account only had $854 in it. Hoffman and Arado borrowed money and then, as Judge King pointed out, circled it around between bank accounts within one day, something the bank employee said she had never seen before. Michael Arado told her, oh, it's just for accounting purposes. After that, they did that money, by the way, with borrowed money. It wasn't even their own money. They borrowed the money, circled it around, then paid off the loan the very next day. It was a zero-sum transaction which every competent professional that understands economic substance is paramount in these types of things. That's what the state is looking for is economic substance hitting the state. The Seven Arch internal accounting records were then falsely altered to make it appear that the money coming back into the SAPLA account was really a capital infusion from the parent company owned by Susan and Peter Hoffman. So what it did was it took a non-existent zero-sum transaction of circular transactions and made it look like a downstream transaction from the parent company to SAPLA to Damon Martin himself. And as if that were not enough, when it came time to Mr. Gibbons was talking about how much they disclosed about the circular transactions, A, you will notice that neither the district court or the defense has addressed what we call the capital infusion ruse. They have stayed away from it in their briefs and it has not been addressed and is one of the key pieces of evidence that the government put on in this case, which I'll talk about momentarily, and how the judge reweighed the evidence in favor of the defendants and against the government. But before presentation to the auditors, RADA intentionally removed all of the legible, clearly stated documents that showed that the money was coming right back into the SAPLA account and presented to the auditor just the outgoing legible ones. So those carbon copy ones that we weren't even allowed to put up on the stand because the district court said it was too illegible, they left those in so that they could later claim they disclosed things, but there's never been an explanation why they would purposely remove all the ones you could read. When you put that on top of the capital infusion ruse, it shows precisely what they were trying to do. To make the statement — Can you acknowledge that there were circular transactions with other applications when a RADA said he looked historically at what had been approved? There are some instances, but it has to have economic substance. So what would be an example of one? An example of one that was described to me in another project, not this project, Your Honor, was a situation where a company, a big company, a big film company might own its own film camera equipment or subcompany. And then that film company puts money into that to pay them, but it's all owned by the same corporation. And that money might eventually make it back into the main corporation. And the reasoning behind that was if we have a smaller company that doesn't own its own camera equipment company, you might be able to take that money and that company would pay this independent camera company, and then they would be able to get tax credits for that. And it's a way of when there's real economic substance and something real happening that they can use that through that financing term. But in this case, what I'm talking about with the film equipment here, at the end of the day, there was no film equipment. But, you know, there were things happening here. I agree. $5 million and they restored an old mansion and got praised for it. And I would like to address that. So we'll end that with the film equipment. He never got paid. Mr. Martin said he never got any money. He said that he never was asked to provide equipment. And there was no equipment. Even to this day, Martin has provided no equipment to this company. But with regard to your question, Judge Dennis, the issue there is that that was one of the things that the court and the defense has looked at, that we actually have a renovated $5 million building sitting over there. The tax credits they received, the million dollars, we proved at trial were wholly for fraudulent expenses. When we talk about the $5 million building and the emphasis put on this building that's been renovated over there, what is being ignored completely is one of the issues that Judge Costa brought up, that there was, for that $5 million building, there were $13 million worth of expenditures submitted for that building. There might have been some, you know, the construction costs. Is it true what somebody said, that they were just, they were entitled to this money or this was a loss, not a loss to the state? They were just getting it faster than they should have. Is that fair? Even just the start, if we move away from the intended loss. Which certainly could be illegal. Yes, sir. So if we move away from the intended loss, which was $3.7 million, and we go to just what was done, did they get it earlier than what they were supposed to, this court has ruled in the Dotson case that you are not, that does not exonerate somebody in a fraud. You are not entitled to defraud somebody. That case I believe was, if I remember correctly, some type of a public employee with regard to benefits that he may have been able and entitled to receive, but he defrauded to get them earlier. And this court held in the Dotson case, this does not happen, and that case actually came out of Judge Feldman's courtroom to this court. But anyway, it is the Dotson case. You are not entitled to defraud somebody to get money that you think or say that you're entitled to later. And at this point, I still don't know that they are entitled to these tax credits. That was a hypothetical representation by the state forensic auditor in the restitution hearing that they may be entitled to future tax credits if a legitimate audit is ever submitted. Is it true that there was no loss to the state because of this, any of this activity? I don't agree with that, Judge. And the reason being is that the state, the money that they paid out, for example, the film equipment we're just talking about, of the tax credits, $400,000 was put in the defendant's pockets for film equipment that does not exist, that's not there. If they maybe put some chandeliers in the old place or something that would entitle them to money for that, possibly, if an audit is ever submitted and that's ever approved, which has not happened. That's all speculation to this point. But with regard to what they have in their pocket right now, at least that $400,000, the other portion of that million dollars we're looking for was for construction fees. But at least with that $400,000, it's for equipment that never happened and it was a complete sham. Your Honor, I'd also like to point out, while we're kind of talking about that on the intended loss that you brought up here, the intended loss here, we have a $5 million building with $13 million worth of expenditures submitted for it, leaving a big room for those types of issues. We all know that we don't have to prove that they actually received the money and just because somebody gets caught before money comes out, it should not be deterred from what their sentence should be because we have to look at the intended loss. But for an example, on the probation sentences I'd like to get into, is that the intended loss, we'll start with Peter Hoffman. The intended loss, no matter what the possibly receivable tax credits were, was $3.7 million was completely ignored. Mr. Hoffman was found to be, and under these enhancements, was found to be a leader organizer. He was found to have committed a crime of sophisticated ways and means. He was found to have abused a position of trust. He was found to have committed perjury at trial. Even when we look at the judge's forfeiture order, which we're asking for the entire amount, but even the judge found that a million, the district court found that a million dollars was criminal proceeds. It called for a sentence of 168 to 210 months with little or no attention to the guidelines. The court vastly deviated to probation in this case. And notably, if Michael Arata was found not to have withdrawn and the conspiracy and false statements reinstated, his guidelines would be the same. Even if the guidelines stay as they are for Michael Arata, his intended loss is $1.9 million. He was a leader organizer. The withdrawal, which I asked the other side about, the withdrawal finding impacted the loss amount attributed. It did. And I disagree with Mr. Bill and with Mr. Gibbons about the withdrawal because the withdrawal directly affected the acquittals on counts 5, 13, 21, 22, and 23. Given that there was no jury instruction, which the defense usually asks for if they think there's a withdrawal issue, what's the standard if the jury never actually, we assume that implicitly the jury found he continued as a member of the conspiracy given their convictions? Defined by a preponderance of the evidence that he withdrew. That's what Judge Feldman. Right, but that would be what the jury would be asked. You have to find by a preponderance that the defendant withdrew. So what are we supposed to review that based on? And that's one of the arguments we made in our brief, Judge, which is that the withdrawal by a preponderance of the evidence that the judge found, and I forget the page on his, it was in the Rule 29 order, but his finding there, he's still reviewing this under Rule 29, which means that although it may be a preponderance of the evidence for withdrawal, he still has to view all the evidence in a light most favorable to the verdict. And I'd like to show you a couple of things right there, especially when it comes to withdrawal. That would be the Lucio case that controls that. It's this circuit in 2009. Withdrawal. So August claims to have withdrawn as of August of 2009. What the court didn't consider in making that, in totally weighing and accepting Michael Arata's testimony, which, Your Honors, both Michael Arata and Peter Hoffman testified extensively at this trial. All their arguments about state law, all their arguments about what they thought it was, their good faith arguments were put directly before this jury. Got to weigh it against them, the false statements counts, they got to weigh Michael Arata's testimony against Special Agent Bobby Blythe's testimony who testified at the trial as well. And they were entitled to make these findings. But with regard with withdrawal, after that October of 2009, Arata agreed to continue assisting on the project and to maximize his value. That's Arata Exhibit 113. He then taught Hoffman's in-house accountant how to conduct circular banking transactions that were used in the subsequent fraudulent expenditures that were submitted in the subsequent things. That's that record on Appeal 612 through 13 in page 6017. He continued to email and support the project to their mutual benefit. That's his quote. He told Peter Hoffman he wanted to continue that. That's Government Exhibit 446. He continued to consult and assist Hoffman when the auditors started to learn about the fraud in the audit and wanted to withdraw, which is, by all auditing standards, testified at this trial, it's an extremely rare thing for after an auditor releases their report to then go back and try to suck it back. I think one of the things that's most notable about this, in my mind, is the series of auditors withdrawing. And we're not talking about Price Waterhouse here either. Well, we're talking about Malcolm Dena's firm, which is a well-established auditing firm over on Metairie Road. Yeah, but that was the last one, wasn't it? No, ma'am, it would have been the second one. The second one. The second one would have been a lady named Catherine Dodge, who also took an extraordinary thing and said she was not getting the information, especially on this capital contributions ruse. She wasn't getting the information she wanted, so she terminated representation. Malcolm Dena's withdrew both of their audit reports. They then hired the Silva firm that withdrew his audit report, at least noted it's under suspicion because of this investigation. He later did withdraw that report. Also, you have to look at besides them, you have Michael Daigle, the state forensic auditor. When we're talking about custom and practice in this matter, Michael Daigle forensic audited for the state 60 film and infrastructure projects. If there's anybody that can be claimed to be somebody that knows what custom and practice is, look at the testimony of Michael Daigle in that trial. He called almost every single one of these expenditures submitted totally fabricated. The jury heard that. The jury was entitled to weigh that and also point out besides those auditors, Judge King, that three of their own in-house auditors testified and testified. One of them said that he asked Peter Hoffman, is this fraud? Then the second one came up and testified that she refused to do some of these transactions because she felt uncomfortable doing it. She didn't think it was right. And then you have Marcia Matthew was the person who came in that Michael Arata taught, after he allegedly withdrew from this thing, how to do the circular transactions. She also testified at the backdating invoices, redacting bank statements, all at Peter Hoffman's distraction. So that's a lot of professionals in this case that testified completely contrary. And the facts, what's important here is the facts that they're talking about under no circumstances. However, this is a federal case. Federal law applies is our argument. But even if you look at the state law, where would it ever be that you can make fraudulent invoices? Where would it be that you can lie about related parties? Where would it be that you could submit false payment receipts, falsely signed payment receipts, saying that you none of the we're not dealing in this world of technical regulations. The government's case was a classic fraud case of absolutely undefensible types of moves by these individuals that importantly showed that they knew what was required here. Because if that wasn't the case, there would have been no other reason for so much concealment and deceit. They would have been able to judge you. You'd have somewhere in this record where there's an email saying, hey, we think we're allowed to do this. Let me ask you because your time is winding down. Yes, sir. I understand with Mr. Arata you've explained why if you're able to show the district court improperly granted Rule 29 acquittals,  Yes, sir. take Peter Hoffman, for example. You also challenge a number of the acquittals. But would that have any effect given what his guidelines were? Would that practically change anything? I mean, I understand we still need to look at the arguments that are raised and both sides have an interest in that. Judge, I'm not 100 percent sure this is, but I don't think so. Peter Hoffman, most of the acquittals here had to do, you know, all the four false statements, a bunch of different types of things had to do with Michael Arata. Peter Hoffman was acquitted on his counts just on the ones that he was also shared with Michael Arata. The rest of the convictions for Peter Hoffman, the judge had no problem with them and they all stood there. But there's enough there that I believe it's not going to change what his guidelines would be. I don't see them going up any. But particularly with Mr. Arata, Mr. Hoffman was held to have committed perjury because he testified differently than what he was convicted of. Well, respectfully, Michael Arata did too, and he didn't get a perjury enhancement, and it was mainly based on the fact that all the false statement counts were thrown out. So if those are put back in, yes, I believe he would get that enhancement and it would extend him to the end of the conspiracy, which we say he did not withdraw, which would, of course, bring all the money that was involved in this right back into his pre-sentence report. Let me ask one question which you may want to answer on rebuttal. Yes, ma'am. Because you have rebuttal, which is not common, but you do, and that's good. Yes, ma'am. If we were to vacate these sentences, what do we do? Then we send it back to Judge Feldman or how? I think you send it back to Judge Feldman, Judge, but we would specifically ask that this court make a finding that probation sentences are unreasonable. And that has been in the several district court opinions that we've – I'm sorry, appellate court decisions that we have cited to you that – they're right here. I'm sorry. It would be the Mistretta case in – the United States case in Mistretta, which talks about guidelines being particularly there to protect against white-collar defendants, the SLEH case by the Fifth Circuit. Importantly, the Eleventh Circuit has pretty strong cases where much less time was suggested that went to probation that they specifically found was substantively unreasonable. That would have been Martin and Livesay, and then the First Circuit in the Muffleman case. We would have to be able to see that under no circumstances would a probation be appropriate. Yes, and I would suggest that it's not. In this type of situation with the amount of money, what this case suggests is, is that defendants, that wealthy financial criminals who do complicated schemes like this, are going to get treated differently than the other blue-collar people that go over into that district court every day and go to jail for far less money and for far less complicated crimes. And I think that's what these cases stand for. But, yes, it would need to be sent back for resentencing. But we would ask that there be, with the provision, like these other circuit courts have said, that at least that a sentence of probation is unreasonable in this matter. Thank you, Your Honor. Mr. Larson. The government referred to this case as a case of textbook fraud. My question would be, what textbook? The jury in this case was specifically instructed at the request of the government that it was not to consider state laws, rules, or regulations, and it need not be shown that the defendants violated any of those. So, once again, we're put into this standardless void of mail fraud. And the government now says, well, this case was about money or property. Okay, yes, but was this property? The government attempts to distinguish Griffin in this case by pointing to a series of factors that are flatly irrelevant. Cleveland tells us what factors we have to consider, what factors are important. None of those were mentioned by the government. None of those were mentioned by the district court. This court, I fear that this court is about to return to a pre-Cleveland view of what is property under the mail fraud statute. The most extensive discussion of what is property under the mail fraud statute from this court is United States v. Salvatore. That was the case that was relied on in toto by United States v. Bankston, which is the case that was reversed by the Supreme Court in Cleveland. I'm familiar with Salvatore. I was his attorney at trial and in this court. Salvatore was also overruled by the Supreme Court in United States v. Cleveland. The Supreme Court in Pasquotano said fraud in connection with evading taxes does involve property, and Judge Feldman says tax credits are just the flip side of tax revenues. How do you respond to Feldman's analogy? Absolutely they are not. Justice Thomas went to great lengths in Pasquotano to distinguish Pasquotano from Cleveland. Historically, taxes assessed due and owing, which was at issue in Pasquotano, have always been treated as a form of property. Taxes due are traded on exchanges. They can be purchased from state entities or city entities. Tax credits are not the same thing until they are issued. And we come back to Judge Dennis's concerns in this case. Until we get past the property issue, we can't get to any of the other questions. I understand that the government would like to talk about proof at trial, but we first have to talk about are we in the realm of mail fraud and wire fraud. There are federalism concerns in this case. They are everywhere. They are can the federal government step into what is essentially a state regulatory scheme dealing with state tax credits, dealing with the state promotion of a state industry. But you seem to acknowledge they can if it's a state grant or if it's just avoidance of state taxes. So really why are the federalism concerns different just when you're talking about this little area of credits? Because what you have to have, Your Honor, is a scheme to defraud that is built around property. And once things become property, there may be federalism concerns if schemes to defraud rely on the mail and wire fraud, mail and wires to create the scheme to defraud. But once we get into the realms of state sovereignty where it is the federal government, the U.S. Attorney's Office, attempting to basically police what is a state taxation program for the promotion of a particular industry, it's entirely different. That's where you get into the concerns of why is the U.S. Attorney's Office policing what should be almost exclusively a state concern. Thank you, sir. Mr. Gibbons, you have three minutes on rebuttal. Yes, sir. Your Honor, both with the sentences in this case and with the Rule 29 verdicts, Judge Feldman stated at trial that in his 32 years on the bench he's only disagreed with two verdicts, one civil, one criminal, and then he did what he did in this case. And it's because it was an extraordinary case and he went to great lengths. It's intensely factual, and I would say almost every fact that the government raised up here, Judge Feldman addresses in his very thorough order on the judgment of acquittal. But a couple of points. Judge Dennis? How do you specifically respond? You make some good points that this state program, the rules as they often are, are kind of hazy and it was unclear and maybe some other folks were doing similar stuff. How do you respond to their argument that if your clients thought they were following the procedures and rules of the state program, why would they have created fake documents and these false invoices, etc.? Judge, I disagree that there were any false invoices in this case. There are two— For the equipment. You think that was— Well, for the equipment, the testimony at trial was that there was an agreement that Damon Martin of Departure Studios would contribute about $2 million worth of equipment in return for 25 percent equity in the company. That was his testimony. The invoices that were submitted to the auditors was the actual equipment that he had proposed to contribute to the company in return for that 25 percent investment. Now, it did—it fell apart. It fell apart after the tax credit submission had been sent to the state in February of 2009. He actually lost the company and that didn't happen, but at the time it was submitted, that was the agreement and that was our understanding and Mr. Martin who testified, that was his understanding as well. And then the second underlying transaction was on the construction costs and there, Leo Duvernay was the contractor. He was paid—$2 million went into an escrow account that was to be used for construction. He was paid the entire $2 million. Ultimately, he was paid $3.8 million to do the work and he did the work. And Judge— Who created the documents? I thought Hoffman created some of the documents that looked like they came from the outside vendors. Your Honor, the—I believe that the construction contract—the construction costs came from a contract that was submitted by Leo Duvernay. It may have been adapted. It may have been created by us, Judge, but everybody knew what was going on. Leo Duvernay knew what was going on. Damon Martin from Departure knew what was going on. And as far as the construction costs, before the tax credit submission was provided to the state, the auditor and the director of the state program were brought on a tour of the project. So they knew exactly what was going on. They knew that $2 million of work had not already been done on that project. Thank you, Judge. Thank you. Mr. Cameron, you have four minutes. First of all, Judges, this is not a case about state law in the first place. This was a scheme about getting something of value. Cleveland was about poker licenses, getting a poker license. Griffin was about getting the ability to build a—possibly build a low-income housing rent. This was always about cash, and it was the cash that was the revenue of the state of Louisiana and the cash from the investors in this case. It would be taking Cleveland so far beyond what it intended to do when we're talking about the end result of the fraud here was money out of the pocket of the state. And so I do not agree that just because they say the word tax credit in Griffin, it doesn't mean all tax credits are the same. They're not the same. They weren't transferable. They weren't sellable in Griffin. They are here. Next. Mr. Gibbons just said that, yes, this is a heavily factual argument. And I'd like to point out here, the reason we're here, especially on the government side of this, is because it was a factual argument that the jury heard. The jury heard all of this. He heard their explanations and, in a rare circumstance, heard extensive testimony from both of the experts, self-proclaimed experts, Peter Hoffman and Michael Arata. And they rejected it, which they had every right to do. The district court does not get to second-guess that at this point. The evidence in light of the verdicts, when you look at our evidence, and it's very well detailed in our things. We give you the sites. We give you the government exhibits. If you take it in the light most favorable to the verdict, we believe that every one of those acquittals should be reinstated. Finally, when we talk about the DuVernay, I just want to mention this one factual mistake I believe Mr. Gibbons just made, the DuVernay construction invoice. DuVernay testified at the trial that he had never seen it. He said it was not on his letterhead. He never told anybody that they could create that. He didn't agree with it. With regard to the he signed two that Susan Hoffman talked him into signing, two payment receipts, and he got on that stand and he said he didn't agree with it. He didn't feel comfortable in signing those, but Mrs. Hoffman convinced him to do it saying it was just for Peter's records. So that's a little bit different than this was something that was okay or we agreed to. Mr. DuVernay didn't do that construction invoice, and it was sold to the state and the auditors as if that construction had already happened. Thank you, Your Honors. Let me ask one thing. Yes, ma'am. The argument is that these credits were not property. Weren't they designed by the state to be property so that people could actually get some benefit from them, even though they didn't have Louisiana income? I mean, the whole idea here was that they would be saleable. The ordinary tax credit might not be property, but here it was designed to be property so that it could actually have some value to the recipient and the transferee. Is that right? I think that's correct. It was designed to become property at a certain point. Yeah. Well, it is also property at the point that it's given to them. You could have a film project or a film infrastructure project where everybody is here local, and they could immediately, that offsets their taxes right there. And I don't think anybody here disputes that future tax revenue or entitlement to tax credits is a property interest of the state that would qualify under the mail-in wire fraud statutes. Thank you, sir. Thank you. Thank all of you for your arguments. Do you want to take a break or do you want to go home?